## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **SONOMEDICA, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:08cv230** |
| | ) | |
| **SAILOR H. MOHLER** | ) | |
| **And** | ) | |
| **SAILOR C. MOHLER** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO LIFT STAY AND TO IMPOSE SANCTIONS AGAINST THIRD PARTY WITNESSES KERRY POINDEXTER, VALERIE POINDEXTER AND OVERFLOW PROPERTIES

Plaintiff, SonoMedica, Inc., ("SonoMedica") by counsel, has requested that the Court enter an Order lifting the October 1, 2008 Order staying this case (and removing it from the active docket) for the limited purpose of having the Court determine the issue of sanctions against third party witnesses Kerry Poindexter, Valerie Poindexter and Overflow Properties, all of whom were found to be in contempt of Court on September 12, 2008. Among the relief sought by plaintiff are substantial monetary sanctions to be paid to plaintiff for (1) its attorney fees and costs related to the contempt matter and the (re-)depositions of the Poindexters, (2) its cost that have been incurred regarding the forensic examination of the Poindexters' computer, (3) the substantial litigation costs[1]

---

[1] At the September 12 hearing, the Court deferred ruling on plaintiff's requests for attorney fees and other costs related to and caused by the contemptuous actions of the Poindexters and Overflow Properties, or other sanctions. (Tr. at 10-11, 19-20). The Court stated, however, that **"the forensic examinations and, the cost of the forensic examinations and the costs of the deposition will as to each deponent be borne entirely by the deponents."** (emphasis added) (Tr. at 11). Moreover, the Court stated

that were expended by plaintiff due to the contemptuous actions of these individuals and Overflow Properties,[2] and (4) the estimated costs that plaintiff will incur in completing the depositions of the Poindexters and the forensic examination of their computer. In addition, plaintiff seeks additional sanctions for the contemptuous actions committed by Kerry Poindexter and/or Valerie Poindexter **subsequent to** Judge Jones' findings of Contempt on September 12, 2008. These actions include (1) the offer of payment of $5000 (plus other payments) by Kerry Poindexter to Sailor H. Mohler if Mr. Mohler would agree to file his Petition for Bankruptcy before the Poindexters' depositions (thereby presumably allowing the Poindexters to avoid or delay their court ordered depositions); (2) the manual deletion of hundreds of files from their computer after this Court held the Poindexters to be in contempt on September 12 and ordered them, in their presence, not to further touch the computers except to turn them off; (3) the failure of either Poindexter to ensure that their computer was turned off on September 12 as ordered by the Court resulting in the automatic deletion of thousands of files and folders; and (4) the Poindexters' failure to testify candidly, honestly and fully at their (re-)depositions subsequent to their being held in contempt.

## **FACTS**

### **The Poindexters and Overflow Properties Were Found in Contempt on September**

---

that as to additional costs related to the motions: "I'm not foreclosing anything…I'm not going to spend any time on it until…I can deal with it as one organic whole." (Tr. at 20).
[2] Overflow Properties LLC is a party to a Finders Fee Agreement with Sailor H. Mohler regarding the December 26, 2007 contract with Passive Diagnostics, Inc., wherein Mr. Mohler purported to sell certain technology belonging to SonoMedica, which is at the heart of the underlying lawsuit in this matter.  Overflow Properties was served with a subpoena *duces tecum* for documents pertaining to Mohler and Passive Diagnostics and produced nothing in response. Mrs. Poindexter, and perhaps Mr. Poindexter, is a member of the LLC, and Overflow Properties is also used as a banking account by the Poindexters for their private affairs. See Discussion, *infra* at 9, 14.

**12, 2008 by Magistrate Judge Jones**

On September 12, 2008 Hon. Magistrate Judge Jones found as follows:

> I find that Mr. Poindexter is in contempt for the reasons asserted in plaintiff's papers.
>
> I find that Ms. Poindexter is in contempt for the reasons asserted in plaintiff's papers.
>
> I find that Overflow Solutions (sic) is in contempt for the reasons asserted in plaintiff's papers.

(September 12, 2008 Transcript at 7).  Plaintiff's moving papers can be found at docket entries 108, 109, 114, 115, 144, 146.[3]

Magistrate Judge Jones then ordered the Poindexters, in their presence, to "each submit to reopened depositions for one or more additional sessions as may be necessary" [and] "to deliver their computers to Mr. Lieberman's office not later than 10 o'clock Monday morning." (Tr. at 7-8). The Court then clearly stated that the Poindexters were prohibited from touching their computers except to immediately turn them off and deliver them to Mr.  Lieberman's office for a forensic examination. The Court stated:

> And, and they may not touch the computers except to turn them off between now and then. They may not do anything that would cause any file to be erased on the computer or changed in any way beyond what

---

[3] The grounds asserted against Kerry Poindexter included: (1) failure to comply with a subpoena *duces tecum* served on him on June 3, 2008 by SonoMedica; and (2) failure to testify truthfully at his June 23, 2008 deposition when, among other things:(a) Poindexter claimed that he never assisted defendant Mohler with the Passive Diagnostics transaction until <u>after</u> December 18, 2007 when Mohler was purportedly "terminated" by SonoMedica; (b) Poindexter claimed that he had entered into the Finders Fee Agreement with Mohler which he had written when it was actually entered into between Overflow Properties and Mohler and written by attorney Pritzker; (c) Poindexter claimed that he had never reached any agreement with Passive Diagnostics regarding his own finders fee; and (d) that his wife had no knowledge of the Passive Diagnostics- Mohler dealings. See Docket Entries 114-115.  The grounds asserted against Overflow Properties and Valerie Poindexter pertained to their blatant failure to abide by a subpoena *duces tecum* served by SonoMedica on June 4, 2008. See Docket Entries 108-109.

might happen through the ordinary, everyday act of turning off the computer.  (Sept. 12 Tr. at 8).

In his concluding remarks, Judge Jones noted that "I have directed the subpoenaed people and entity to do certain things, and I have continued the matter for further proceedings. So, you will not see a written order yet as a result of today's hearing." (Tr. at 20).

In its Minute Order, the Court was clear as to its rulings that the Poindexters were to deliver their computers to plaintiff's counsel on September 15, 2008 and that "they may not touch the computer except to turn them off between now and then."  See Minute Order. (Docket No. 151).

At the September 12, 2008 hearing the Court also scheduled two hearings before Hon. Judge Lee because Magistrate Judge Jones noted that he did "not have the power to jail someone for contempt. Judge Lee does." (Tr. at 9). Moreover in providing the Poindexters with the opportunity to purge themselves of contempt, Magistrate Judge Jones responded to the Poindexters' counsel's question of whether the parties would purge themselves of contempt by "participating in the redeposition" by stating:

> Not by participating, not merely by participating, but by having produced everything that the subpoena required them to produce and by having testified truthfully at the depositions.  Merely showing up is not going to be enough to purge anyone of contempt.

(Tr. at 12).

Thereafter, on September 15, 2008, at or before 10 o'clock a.m., Mr. Poindexter delivered a single laptop computer that the Poindexters have represented was their only computer and was the computer that they used for their personal business and for Overflow Properties business.

**The Forensic Examination Reveals The Deletion of Files and Folders After The September 12 Contempt Hearing**

After receipt of the laptop, later that same day, the Poindexters' laptop computer was brought to Sensei Enterprises ("Sensei") for a forensic examination.

On September 17, 2008, Sensei issued its initial report disclosing that the Poindexter computer had not been turned off until 3:45 a.m. on September 15, 2008 (just hours before it was brought to Lieberman's office). Sensei's examination of the computer disclosed that approximately 22,603 files/folders were affected by the computer being operational from September 12 through September 15, and that during this time period approximately 1,667 files were deleted either automatically by the computer operating system or by the user(s) of the computer.[4]  See Exhibit 1.

Moreover, it was thereafter determined that at least 556 files and folders were **deleted manually**, "user initiated," between September 12 (after court) and September 15 (when the computer was brought to Lieberman's office), and these deletions were clearly **not** the result of any automatic electronic application initiated by the system. See Exhibit 1 with attachments. These deleted files included Microsoft Word documents, Excel spreadsheet documents, Adobe PDF documents and other types of documents and files. *Id.* Of the 36 Microsoft Word documents that were recovered by Sensei after their deletion, 28 referenced or were related to SonoMedica. Similarly, 25 of the 54 deleted Adobe PDF documents referenced or were related to SonoMedica.  All of the deleted Microsoft Power Point documents and Excel spreadsheet documents were related to

---

[4] According to Sensei, the activity ranged from Friday, September 12, 2008 at 7:15 pm to Monday, September 15, 2008 at 3:45 am (ending with the computer being shutdown). The activities included file/folder creation, modifications, access, deletion and MFT entry modification (both user initiated and system [no user intervention] initiated). Exhibit 1.

SonoMedica. In total, there were 84 documents deleted that referenced or related to SonoMedica. See Affidavit of Michael Barnsback, Esq., Exhibit 2 with spreadsheet attachment.

Remarkably, Sensei found that all of these "user-initiated" deletions did not begin until after the Poindexters were in court on September 12 and ordered by Judge Jones to turn off and preserve the computer and not make any deletions.

**The Deposition of Valerie Poindexter**

Mrs. Poindexter appeared for her deposition on September 24, 2008.  She did not bring any documents responsive to the subpoena to Overflow Properties with her. At her deposition, Valerie Poindexter admitted that she had not turned off the computer on September 12 after the Court hearing and that she used the computer throughout the weekend of September 12 p.m. through September 15 a.m.  The colloquy with counsel, Mr. Lieberman, was as follows:

> Q. … Ma'am, you were in court on September 12th before Judge Jones; is that correct?
> A. Yes….
> Q. And you did hear what the judge ordered to be done that day, is that correct?
> A. Yeah, I think so.
> Q. Do you recall the judge ordering that your computer be turned off?
> A. Yeah.
> Q. And be kept off and brought to my office at 10:00 a.m. on Monday, September 15th?
> A. I didn't—I heard—I don't know if I heard those exact words, but what I thought he was saying was that we weren't to delete anything or to---because I did use the computer after that, but I didn't delete anything.

Exhibit 11 (VP Tr. 7-8).

Mrs. Poindexter then acknowledged that she used the computer throughout the weekend, and claimed that she was the person who turned it off at 3:49 (sic) in the

morning on September 15. Exhibit 11 (VP Tr. 10).  As to the Court's Order not to touch the computer she testified:

> I made sure that I did not delete any files, because I was informed by our lawyers at that time, which was Chester Banks, he said that we could use the computer, just don't delete any files. So he said don't even delete AOL files. There were no deletion of files at all after the judge told us.

Exhibit 11 (VP Tr. 11).

A complete reading of her deposition makes it clear that as a practical matter the only persons who had access to this computer from September 12 through September 15 was Valerie Poindexter and her husband, Kerry Poindexter, (although technically her son and brother could possibly have had such access). Mrs. Poindexter claimed that "my husband and I made sure we did not delete any files after the 12th." Exhibit 11 (VP Tr.13).  When asked why she knew that her husband did not delete any files she said: "[b]ecause if he was to use the computer, he would come and ask me, because he's not really computer savvy[5], and if he'd have to write an e-mail or anything, he would come and ask me..." Exhibit 11 (VP Tr. 13)[6]

---

[5] It later became abundantly clear that Mr. Poindexter does know how to use a computer. He knew how to type emails, send reply emails and obtain attachments to emails. The only issue was that Mrs. Poindexter usually typed his lengthier emails because "he doesn't type fast." Exhibit 11 (VP Tr. 26-27).

[6] During the deposition, Mrs. Poindexter acknowledged that she had typed most of the email correspondence on behalf of her husband that was sent from the email account, kpoindexter7@aol.com, including those to Pritzker, Eichelberger, Litman or the Mohlers. (VP Tr. 14-15). Accordingly, Mr. Poindexter's prior deposition testimony on June 23, 2008 that his wife knew nothing about Passive Diagnostics, SonoMedica and Mohler related matters was just false. See Exhibit 11 (KP June 23 Dep. Tr. 177-179; 182-183; 185-187) ("she would have no knowledge at all").  At her September 24, 2008 deposition, Mrs. Poindexter was not asked about the contents of the emails on the Poindexters' computer because at the time of her deposition, plaintiff had not been provided a copy of the emails that were located on the Poindexter computer by Sensei. It was agreed that Mrs. Poindexter's deposition would be reopened after these documents were obtained from Sensei. Exhibit 11 (VP Tr. 91-92). However, shortly after the

Parenthetically, Mrs. Poindexter also claimed that she had not deleted any emails over the last year, except junk mail, so that all emails pertaining to Mr. Mohler, Passive Diagnostics, Mr. Cullen, Mr. Eichelberger (e.g. the documents sought by the subpoena) should still be on the computer. Exhibit 10 (KP Tr. 18).

As noted below, the forensic examination of the files from the Poindexter computer do not appear to contain all of the emails of which plaintiff is aware that were sent to or from KPoindexter7@aol.com that should have been on the computer. Of course, as to those that plaintiff is unaware, there is no way of knowing whether any deletions occurred prior to September 12. See Discussion *infra* at 19-22. These serious discrepancies remain unexplained and need to be further pursued when the depositions of the Poindexters are continued. The question posed in plaintiff's original moving papers remains: **"what else has not been produced or uncovered?"**

Other relevant information that may impact upon the issues now before the Court includes the following:

* Mrs. Poindexter admitted that after receiving the subpoena for Overflow Properties she "didn't do anything" insofar as attempting to comply with its terms. She said her husband "handled it." Exhibit 11 (VP Tr. 15). Up to the date of her receipt of the subpoena on June 3, 2008 up through the September 24, 2008 day of her deposition she had **never** been asked to examine the computer for any files or documents that were responsive to the subpoena, she has never personally reviewed the computer for such files, and to her knowledge, the computer has never been examined for any documents

---

deposition, the Mohlers' filed for bankruptcy and a stay was entered in this case precluding the continuation of Mrs. Poindexter's deposition with out further order of the Court, which is sought herein.

that are responsive to either the Overflow Properties subpoena or the Kerry Poindexter subpoena. Exhibit 11 (VP Tr. 16);

    * Mrs. Poindexter claims that the first time she saw the Finders Fee Agreement (between Overflow Properties and Sailor H. Mohler) was after Mr. Poindexter had signed her name on it. She claims that her husband had permission to do so because he "signs my name to different documents pertaining to Overflow Properties" and also signs her "visa check card." [7] Exhibit 11 (VP Tr. 20-21). However, she never gave him specific permission to sign her name to the Finders Fee Agreement… "he just came back and told me what he did, and I was like okay." Exhibit 11 (VP Tr. 22).

    * Mrs. Poindexter testified that Overflow Properties was created as a result of their real estate business;[8] that she and her husband created it together Exhibit 11 (VP Tr. 41); and that she believes that her husband is a member, testifying that "he is the managing member" Exhibit 11 (VP Tr. 41-42). She also testified that Overflow has never paid any taxes, although she does not know why Exhibit 11 (VP Tr. 42-44). However, Mrs. Poindexter testified that at the time of the deposition Overflow owned a property known as the Herder property.[9]

---

[7] In fact, she testified that her husband signed her name on several of the checks that were received from Cullen and his companies that were made out to Mrs. Poindexter and to Overflow Properties. Exhibit 11 (VP Tr. 51-65). These checks were paid by Cullen as part of the  Finders Fee Agreement for the Mohler-Passive Diagnostics deal.

[8] It appears from the deposition that the Poindexters use Overflow Properties as their personal banking account, at least in part to keep their financial affairs from becoming known to her husband's creditors. Exhibit 11 (VP Tr. 38-41)

[9] Since that time, on or about November 19, 2008, the Herder property has been sold and Overflow has received, upon information and belief, $1,050,000.00 from the sale. It should also be noted that this property has been the subject of loans and payments to the Poindexters/Overflow by Cullen and Eichelberger.  Mrs. Poindexter testified that Cullen and Eichelberger provided the Poindexters at least $10K regarding the property. Exhibit 11 (VP Tr. 74-75). Accordingly, Overflow Properties and the Poindexters are presently

**The Deposition of Kerry Poindexter**

On September 24, 2008, Mr. Poindexter was re-deposed in this matter. No documents were produced at the deposition by either of the Poindexters, and at the time of the deposition, plaintiff had not received any documents from Sensei from the Poindexter computer. Accordingly, the deposition of Kerry Poindexter, like that of his wife, was never completed, pending receipt of those documents from Sensei.[10]  However, during his deposition, Kerry Poindexter testified to the following points that are relevant to the instant motion:

* after receiving the subpoena from Plaintiff, Poindexter did not look through his computer for any documents responsive to the subpoena, claiming: "I looked through my files that were responsive to your subpoena in my files, and my documents I did not go

---

more than able to pay the plaintiff the funds and sanctions sought through this Motion.
[10] On September 16, 2008, after this Court ordered on September 12, 2008 that the cost of the depositions and the cost of the forensic examination be borne by the deponents, plaintiff's counsel (Lieberman) sent a letter to deponents' counsel (Banks) requesting, first, that the Poindexters provide plaintiff with whatever "additional documents [they had that] were covered by their subpoena *duces tecum* related to this matter" and second, that the deponents place the anticipated cost of the depositions and forensic examination in escrow. Plaintiff's counsel provided the Poindexters' counsel with hard copies of estimates for the transcription of the depositions and the forensic examination and provided an estimate for the attorney fees attendant to the depositions. See Exhibit 3. Although some funds were promised to be deposited ($10,000) in escrow prior to the depositions, no money was ever forthcoming. In light of the heavy expenses involved already incurred in this case, and the substantial cost of having a full forensic examination performed on the computers, only a partial examination was requested by plaintiff.  However, even that partial examination could not be completed in time for the September 24 deposition.  See Exhibit 1.  Thus far, the partial forensic examination has cost the Plaintiff $12,989.66 ($14,989.66 less $2000 related to the Cullen computer). See Exhibit 1.  Plaintiff seeks reimbursement for that expense, among many others, through this Motion.  Plaintiff also seeks that the Court orders that the Poindexters provide plaintiff's counsel with the estimated funds so that the examination of the computer may be completed.  Sensei estimates the future cost to be up to $6,000.00. See Exhibit 1. Plaintiff's counsel will place the funds in escrow pending an invoice for Sensei for the continued work.

through because I have a lot of documents related to other matters" Exhibit 10(KP Tr. 8-

9);

    * Mr. Poindexter testified that at the September 12, 2008 court hearing he

understood Judge Jones' instructions to his wife and him to mean: "to cut it [the

computer] on and cut it off. I mean, just make sure you cut it on—cut the computer on,

cut it off, and do not delete anything off the computer." Exhibit 10 (KP Tr.14-15).  When

specifically asked if anyone touched the computer despite the court's instructions, the

colloquy went as follows:

> A.  … I don't know if my wife looked up her bank account statements or
> did anything to it but, no, I didn't touch the computer. To my knowledge,
> no, I don't recall that I touched it at all. I mean, I have other businesses I
> run, but there's no way possible that if a judge gave me an order to do
> something and say we're in contempt of court, that I'm going to go against
> his rules.
> Q. Did you turn off the computer as soon as you got home that day?
> A. No, I did not turn off the computer as soon as I got home that day.
> Q. When did you turn off the computer?
> A. I don't know if my wife turned it off, Mike. I can't recall who turned
> the computer off.
>  *    *    *    *    *
> Q.  Did you turn off the computer?
> A.  I can't recall if I turned off the computer. I didn't come rushing home
> and turn off the computer. We didn't go directly home, Mike.
> Q.  After court, can you testify under oath who turned off the computer?
> A.  No, I can't testify under oath, because I don't know if my wife turned
> it off or used it for any other matters. I don't know. She watches the
> Inspiration Channel. She checks the bank account with it.
> Q.  What efforts did you personally make to comply with the Court's order
> to turn off the computer?
> A.  My effort that I made to comply with the Court's order was to turn
> over the computer, and I thought he was mentioning to turn off the
> computer anything that's related to this particular case.
> Q.  Can you explain your answer please?
> A.  Well, I'm trying to explain my answer. When Judge Jones said, I want
> you guys to turn off your computer, do not delete anything, okay, that's
> the impression that I was under that he wanted us to do. If anything was
> related to stuff that we need to keep up with with our bank account to see
> what bill was due because that's my main operating computer, she

> probably followed procedures by looking at stuff that needed to get done like bills due or she watches The Inspiration Channel a lot…
>
> Q… what did you interpret Judge Jones to mean when he said turn off your computer?
>
> A. Well, I interpret it that he said "turn off your computer," to me, my interpretation was that he didn't want us to do anything with the computer regarding any type of files or any deletions of files. That was my interpretation.

Exhibit 10 (KP Tr.16-18). Mr. Poindexter stated that he did not believe that he touched the computer except to pack it up and bring it to counsel's office. (KP Tr. 19).  He also testified that he had no knowledge of anyone deleting any files between September 12 and September 15. Exhibit 10 (KP Tr. 22-24).

    \* Mr. Poindexter admitted that as to his prior deposition testimony on June 23, 2008 to the effect that he essentially knew of no negotiations regarding the Passive Diagnostics-Mohler deal prior to December 18, 2007—that testimony was incorrect. Exhibit 10 (KP Tr. 27).[11] Indeed, he acknowledged, at one point, that there might have been "a lot of discussions" during that time period. However, (and despite plaintiff's documentary evidence to the contrary), Mr. Poindexter repeatedly attempted to minimize his involvement in the pre-December 18 negotiations, testifying, for instance, that he was not really part of the pre December 18 discussions, and that he only received one draft document. Exhibit 10 (KP Tr. 27-28). However, later during the deposition, he admitted that he had been present at two meetings at attorney Pritzkers' office regarding Passive Diagnostics and Mohler, and that he had conversations with Eichelberger regarding the

---

[11] In his opposition to the motion to show cause, counsel for Mr. Poindexter stated that his deposition testimony appeared to be inconsistent with the documentation found by plaintiff, but as the Court may recall, that inconsistency was blamed on Mr. Pritzker's (his prior counsel) failure to prepare Mr. Poindexter for his deposition. See Opposition at p. 2-3. Docket No. 142.

sale of technology by Mohler to Passive Diagnostics. Exhibit 10 (KP Tr. 52-73).[12]

> \* Mr. Poindexter also testified that the Passive Diagnostics-Mohler contract that was signed by Sailor H. Mohler on December 10, 2007 was sent to him from Ken Martin, and that he (Kerry Poindexter) and Ken Martin had conversations about the signed document before it was sent. Exhibit 10 (KP Tr. 29-37)[13]

> \* Mr. Poindexter also testified that his "mentor," Jeffrey Litman, was involved in every meeting regarding the Passive Diagnostics and Mohler transaction thereby identifying Mr. Litman as an extremely important witness.  The extent of Mr. Litman's involvement was never disclosed to plaintiff during Mr. Poindexter's first deposition, and a majority of the emails between Mr. Litman and Poindexter were never provided by Mr. Poindexter when he first produced documents in June.   Those emails had to be obtained by a subsequent subpoena to Mr. Litman and his employer at Meisel and Associates. See Exhibit 5.  Interestingly, many of the Poindexter emails obtained from Litman were not found on Poindexter's computer by Sensei.[14]  Moreover, because of the late date at which plaintiff finally obtained the information regarding Mr. Litman's involvement (at the end of discovery), Mr. Litman's testimony has not been able to be taken in the underlying

---

[12] A review of Poindexter's deposition reveals constant equivocating and evasiveness by Poindexter. Exhibit 10 (KP Tr. 52-73)

[13] This testimony is demonstrably false.  The signed document came from Sailor H. Mohler, who faxed it from Mr. Martin's office. See Exhibit 4.  Mr. Poindexter's testimony regarding his conversation with Mr. Martin about Mohler and Passive Diagnostics are contrary to the documentary and deposition evidence obtained in this case and plaintiff believes this constitutes Mr. Poindexter's further false statements and efforts to mislead the Plaintiff. This time, however, Mr. Poindexter's testimony was not only made under oath, as before, but also was made in the face of this Court's instructions and finding of contempt.

[14] Some of the Litman emails were obtained from attorney Pritzker after his contempt hearing. However, these documents were from Mr. Pritzker's files and produced pursuant to a subpoena directly to him.  These documents were produced, it appears, after receiving a waiver from Poindexter.

case against the Mohlers.[15]

      * As to the Finders Fee Agreement, at his September 24 deposition, Mr. Poindexter admitted that the Agreement was structured as being between Mohler and Overflow Properties and that his June 23 testimony to the contrary was false.  Moreover, Mr. Poindexter testified that his wife had not signed the Finders Fee Agreement but instead he had signed his wife's name to it. He testified that he had not received authority to sign her name on behalf of Overflow Properties until after the fact. Exhibit 10 (KP Tr. 106). During his re-deposition, contrary to his wife's testimony that he is the managing member of Overflow, Mr. Poindexter testified that he is not even a member of Overflow Properties. Like his wife, he explained that Overflow Properties was basically used as the Poindexters' personal banking account because he did not have a bank account. Mr. Poindexter also testified that whatever funds he would be paid would go in to the Overflow account.[16] Exhibit 10 (KP Tr. 108-109).  Mr. Poindexter testified that when he signed his wife's name on behalf of Overflow, he did so at Pritzker's office, in front of attorney Pritzker. Moreover, he testified that his signature of his wife's name was witnessed by Mr. Litman, who then signed the document as a witness that Mrs.

---

[15]As the Court may recall from the attachments to plaintiff's Reply Memorandum in Support of the Motion to Show Cause (Kerry Poindexter)(Docket No. 146), emails involving Poindexter, Litman and Pritzker demonstrate that negotiations between Sailor H. Mohler and Passive Diagnostics aka Kingston Group had been going on since at least October 16, 2007 (Exhibit A to Reply);  Mr. Litman, Mr. Pritzker, Mr. Poindexter were involved in setting up a "plan of action" with Mohler as early as October 25, 2007 (Exhibit B to the Reply) the finders fee agreement was being negotiated as early as November 28, 2007 with Litman and Pritzker (Exhibit C to Reply); and that Poindexter had at least one additional draft agreement that he sent to Mr. Litman on December 13, besides the December 10 signed agreement (Exhibit D to Reply). All of this information was known to Mr. Poindexter at his first deposition but withheld from plaintiff until discovered as part of these proceedings.

[16] Mr. Poindexter also confirmed his wife's testimony that Overflow Properties had not filed any tax returns. Exhibit 10 (KP Tr. 116)

Poindexter had signed the Agreement.  Mr. Poindexter was clear that everyone in the room (including Mr. Mohler) knew that he was signing his wife's name to the Finder's Fee Agreement. Exhibit 10 (KP Tr. 110, 115).

      * Finally, Mr. Poindexter testified that everything relevant to this lawsuit and the Mohler-Passive Diagnostic transaction was still on his computer (in a file entitled "KSF"), and he had no knowledge of anything having been deleted after appearing in Court on September 12, 2008. Exhibit 10 (KP Tr. 24, 185-186)[17] Sensei attempted to find the "KSF" folder on the computer, but could not.  According to Sensei, it does not appear that such a folder was deleted.  It is more likely that it never existed in the first place. Affidavit of Michael Barnsback, Exhibit 2.

**Just Prior to his Deposition, Kerry Poindexter Offered To Pay Sailor H. Mohler Over $5000 If Mohler Would File For Bankruptcy Before The Poindexters' Depositions**

      Plaintiff has learned that after being held in contempt on September 12, 2008, and a few days prior to the scheduled depositions of the Poindexters, Kerry Poindexter contacted defendant Sailor H. Mohler and offered to immediately pay him $5000, plus future payments, if Sailor H. Mohler would file his contemplated Petition in bankruptcy

_____

[17] Poindexter also testified regarding an email that he had recently received from Eichelberger pertaining to Passive Diagnostics selling a distributorship territory in Canada for the sale of the coronary artery detection device which is at the heart of the litigation with Mohler. Exhibit 10 (KP Tr. 180-187). This critical email has never been seen by plaintiff, and does not apparently exist on Poindexters' computer. Moreover, the other emails that involved Eichelberger were never found as well. As this Court may recall, during the depositions of Eichelberger, Sailor H. Mohler, and Sailor C. Mohler, all three admitted to not preserving their emails. Exhibit 13 (Eichelberger Tr. 49-53, 58, 175); Exhibit 14 (SHMohler Tr. 17-23). Sailor C. Mohler even acknowledged destroying the emails after the litigation started, Exhibit 15 (SCMohler Tr. 67-72; 177-179; 182-183; 185-187; 206-207), and when his computer was forensically examined, the emails could not be recovered. See Court Hearing on July 30, 2008 (ordering Sailor C. Mohler to pay the total cost of the forensic examination).  Exhibit 17, Transcript at 19-20.

prior to the Poindexters' depositions.[18]  Mr. Mohler refused Mr. Poindexter's offer.

**Plaintiff's Expenses In Pursuing This Matter And Related to Poindexter's
Misleading Testimony**

At the September 12, 2008 contempt hearing, the Court deferred ruling on

plaintiff's requests for attorney fees and other costs related to and caused by the

contemptuous actions of the Poindexters and Overflow Properties, and for other

sanctions. (Tr. at 10-11, 19-20). The Court stated, however, that "**the forensic**

**examinations and, the cost of the forensic examinations and the costs of the**

**deposition will as to each deponent be borne entirely by the deponents.**" (Tr. at 11).

Moreover, the Court stated that as to additional costs related to the motions: "I'm not

foreclosing anything…I'm not going to spend any time on it until…I can deal with it as

one organic whole." (Tr. at 20).

After the September 12 hearing, plaintiff requested through the Poindexters

counsel that they place funds into plaintiff's counsel's escrow account to cover the

estimated cost of the forensic examination and the costs of the depositions. See Exhibit 3.

Although Poindexters counsel originally stated that at least $10,000 would be placed into

escrow that never occurred.  While the depositions and forensic examination of the

Poindexters (and Mr. Cullen) are not yet completed, substantial expenses have been

incurred by the plaintiff's for which immediate compensation is requested through this

Court.

First, the cost of the forensic examination by Sensei Enterprises for retrieving

documents from the Poindexter computers thus far totals: $12,989.66. (This includes the

---

[18] Mohler did file a Petition in Bankruptcy Court in Maryland on September 26, 2008, and
filed a suggestion in bankruptcy with this Court on September 29, 2008.  As noted above,
Mr. Poindexter's deposition took place on September 24, 2008.

retrieval of documents that had been deleted by the Poindexters after this Court's September 12 hearing). See Exhibit 1. In addition, Sensei estimates that it will cost up to approximately $6,000.00 to complete its retrieval of documents from the computer that were, or likely were, covered by the June 3 subpoenas *duces tecum* to Kerry Poindexter, Valerie Poindexter and Overflow Properties. Exhibit 1.

Second, the initial deposition of Kerry Poindexter, where he falsely testified, took 4 hours. The charge for the court reporter and transcription of this deposition was $917.40. Exhibit 6. The initial deposition of Kerry Poindexter was conducted by Mr. Lieberman (at $350 per hour) and attended by his paralegal and assistant in this case, Kelly Hauck (at $125 per hour).[19]  According to the billing records, Mr. Lieberman expended 9.5 hours in preparing for that deposition and Ms. Hauck expended 10.75 hours in getting exhibits prepared and in assisting Mr. Lieberman. Lastly, as to this initial deposition, Mr. Lieberman expended 6.65 hours in reviewing the deposition (and subsequent investigation and review of late produced documents), and Ms. Hauck expended an additional 3.5 hours in tracking down additional information that proved that Mr. Poindexter testified falsely during the deposition. The attorney fees and costs, as well as the cost of the court reporter and transcription arising from the first deposition has been calculated at being $10,251.15. See Exhibit 7.

Third, the court report fees and transcription fees for the September 24, 2008 depositions of Kerry Poindexter and Valerie Poindexter were $1,513.10. Exhibit 8. The

---

[19] Plaintiff will submit to the Court its billing records to SonoMedica (in a redacted and proper form) regarding this matter as instructed by the Court when an appropriate hearing is scheduled. In this initial filing, Plaintiff has submitted the Affidavit of attorney Michael Lieberman with a summary attesting to these fees and costs as thus far ascertained. See Exhibit 7.

depositions took 7 hours, combined, and was conducted by Mr. Lieberman (at $350 per hour) and attended by Ms. Hauck who assisted (at $125 per hour).  Preparation for the deposition and subsequent time in reviewing the deposition totaled 8.6 hours of Mr. Lieberman's time and 10 hours of Ms. Hauck's. Accordingly, SonoMedica incurred attorney fees and costs of $7585.00. The total attorney fees and costs, as well as the cost of the court reporter and transcription for these depositions have been calculated at being $9098.10.  Exhibit 7.

The fourth category of costs associated with the contemptuous conduct of the Poindexters pertain to the attorney fees and costs incurred in bringing and adjudicating the Motions to Show Cause; the Motions that the Poindexters be held in contempt and in preparing the instant Motion for a Lift Stay and sanctions. The total attorney fees and costs incurred to date relating to these Motions are $37,373.75. Exhibit 7.

The fifth category of costs associated with the contemptuous conduct of the Poindexters pertain to the costs and fees incurred because plaintiff was misled by the Poindexters and because plaintiff had to obtain the documentation to prove that the Poindexters were not complying with the subpoena's served upon them.  These costs include such actions as follows:

* time expended in communicating with and coordinating forensic examination by Sensei Enterprises and production of documents and list of files;

*time expended in reviewing list of files and documents produced by Sensei;

* time expended in communicating with and coordinating with Meisel and Associates to obtain Litman emails;

*  time expended in communicating with and obtaining documentation from Mr.

Jenkins, counsel for Passive Diagnostics;

     * time expended in investigating Poindexters' claims regarding interactions with Martin, Reichenbach and other SonoMedica personnel;

     * time expended in communicating with and obtaining additional documents from attorney Pritzker;

     * time expended in communicating with Mohler attorneys (post filing of Motion to Show Cause)

     Conservatively, the attorney and paralegal time spent that otherwise was unnecessary but for the actions of the Poindexters is $13,222.50. See Exhibit 7.

     Moreover, the preparation and continuation of the Poindexters' depositions is estimated to cost an additional $5,000 (conservatively) and the additional time to respond to any opposition to this Motion to Lift Stay and to prepare and to hear the motion is estimated, conservatively, at $1,650.

     As set forth in exhibit 7, the total attorney fees and costs to Plaintiff because of the Poindexters' contemptuous actions is approximately $97,146.16 to date, which should be repaid to plaintiffs. Exhibit 7.

     Respectfully, this is the starting point for the Poindexters being held responsible for their actions.  As noted in the argument section below, Plaintiff believes that in addition to repaying the plaintiff for its attorney fees and costs, the Poindexters actions warrant additional heavy sanctions by the Court.

**At This Point Files and Documents That Should Have Been on the Poindexters Computer Were Not Found By Sensei.**

     As noted, plaintiff's forensic experts have conducted a review of the Poindexter computer and have provided to the plaintiff the documents that could still be found on the

computer or which could easily be retrieved from the deleted file folders. There are additional areas to be inspected, including unallocated space where deleted files and fragments of deleted files are often found, that still needs to be examined. But, based on the examination to date, plaintiff has determined that there are critical documents and emails that should have been found on the Poindexter computer, but which were not. These include emails that directly pertain to the Mohler-Passive Diagnostic deal, and Poindexters role in it, and SonoMedica, which Plaintiff knows exist because these documents have been retrieved through subpoena *duces tecum* to other parties. These documents are set forth in Exhibit 5 and include the following emails sent to or from KPoindexter7@aol.com that were obtained through a subpoena duces tecum to Jeffrey Litman[20], Kerry Poindexter's "mentor":

1.      Bates No. Litman 135:  Poindexter to Pritzker;   cc: Litman
        October 16, 2007
        "….I would like to know your feelings on the conversation that you had with
        Sailor Sr. Also, I want to bring you up to speed with the conversation I had with
        Sairlor [sic] Sr. & Jr. and the Kingston Group.  Please call me at home or on the
        cell no matter how late it is."

2.      Bates No. Litman 183-188: Poindexter to Pritzker and Litman
        October 25, 2007
        "I spoke with Sailor, Sr. … to set up a meeting for Mon. or Tues of next week if
        Mr. Pritzker' schedule will allow it. Sailor said that he would like myself and Mr.
        Litman to attend this meeting to lay out a plan of action. I have a meeting
        attentively[sic] set up with the Kingston Group that following Wednesday
        providing that we execute a game plan…"
        Attachment: Shareholder letter and Terms of Convertible Loan

3.      Bates No. Litman 190-191: Poindexter to Pritzker and Litman
        November 28, 2007
        "Attached is a request list that I forwarded to Passive Diagnostics/Kingston. Also,
        I'd like 10% finder's fee in stone with Sailor once the deal has been executed.
        We agreed on 10% of all $25,000.00 installments that he will receive each month,
        10% of the fee for service monies that he will receive and 10% on the 1.5 million

---

[20] See also footnote 14, *supra* at 13-14.

and the $750,000.00 when a landfall deal takes place.  I really feel that I deserve this for putting this deal together.
Thank you Jeffrey Pritzker for getting everything in stone and helping with negotiations of this deal…"
Attachment:  REQUEST LIST

4.      Bates No. Litman 192: Poindexter to Litman
        December 13, 2007
        "attached is the revised agreement that Fred came up with… I have not forwarded it to Mr. Pritzker or to Sailor until we discuss it first…. I have to call Fred back tonight and tell him that I did not get a hold of Sailor.  Please call me ASAP in the morning before I forward these documents to Sailor."

5.      Bates No. Litman 193-194:  Litman to Poindexter
        December 14, 2007
        "Kerry, I would not send these to Sailor--- tried to call you early but no answer, kindly call."
        Also copy of December 13, 2007 email from Poindexter to Litman (Litman 192)

6.      Bates No. Litman 198-199: (two emails)
        Poindexter to Litman and Pritzker
        December 31, 2007  2:27pm
        Re: Request List
        "below is my "request List" I have sent to Passive diagnostics. If you have anything to be added, please do so"
                Request List with 7 items listed

        Litman to Poindexter
        December 31, 2007   3:37pm
        Re: Request list
        On our way to get you what you need

7.      Bates No. Litman 200-201:  Poindexter to Pritzker and Litman
        January 7, 2008
        "Here is an outline of what Passive Diagnostics offered me.  This is not acceptable. I need you, Mr. Pritzker and Mr. Litman to immediately contact me. We have a major problem with Sailor Sr."
        Attachment:  Passive Diagnostics, USA, Inc.  Draft  1/4/08
                Letter clarifying and outlining operations of Passive Diagnostics and offer
                to Poindexter

8.      Bates No. Litman 202:  Poindexter to Litman and Pritzker
        February 21, 2008
        "Attached is the basic outline that Passive Diagnostics wants to offer me…."

        In addition, the March 4, 2008 letter from Poindexter's attorney (Pritzker) to

Passive Diagnostic's attorney (Jenkins), with a draft Distributorship Agreement for Poindexter attached (Bates SM 2797-2805) should have been found on the Poindexter computer but was not. Exhibit 9.

Plaintiff has no explanation for these documents not being on the Poindexter computer.  Perhaps there is another undisclosed computer.  Perhaps these documents were deleted and will be found upon the subsequent forensic examination.  Clearly the documents exist and they were in the possession of the Poindexters at some point in time.  Yet they were never produced by the Poindexters--- leaving the question:  **What else has not yet been produced or uncovered?**

## ARGUMENT

**A.**     **This Court Has Jurisdiction To Lift The Stay In This Matter In Order to Impose Sanctions Against Third Party Witnesses Such As Kerry Poindexter, Valerie Poindexter and Overflow Properties**

As a third party witness, the Poindexters and Overflow Properties have no right to rely on the automatic stay given to the Mohler Defendants after they filed their bankruptcy petitions.  The language of the automatic stay provision under 11 U.S.C § 362(a), makes clear that a bankruptcy filing operates as a stay of "the commencement or continuation . . . of a judicial, administrative, or other action . . . against the *debtor* . . . ." 11 U.S.C. § 362(a)(1).  On its face, the stay provision only applies to the debtors, Defendants Sailor H. Mohler and Sailor C. Mohler, and does not extend to third parties witnesses such as Kerry or Valerie Poindexter, or Overflow Properties, who are not even co-defendants in this case.

Indeed, even a party to the lawsuit, such as either of the Mohler Defendants, could not use the stay in their own bankruptcy case to shield themselves from contempt

proceedings before this Court.   It is well established that allowing those allegedly in

contempt of court to avoid possible penalties by filing for bankruptcy would enable

parties to "blatantly violate direct orders of [a] court and then seek shelter from a

bankruptcy judge." *Am. Online, Inc. v. CN Prods., Inc.*, 272 B.R. 879, 881 (Bankr.

E.D.Va. 2002) (holding that plaintiff's discovery requests served for the purpose of

determining if defendant was in contempt were not stayed by the defendant's bankruptcy

filing) (quoting *U.S. Spring Comm's Co. v. Buscher*, 89 B.R. 154, 156 (Bankr. D.Kan.

1988) (internal quotations omitted)).  "The bankruptcy process cannot be invoked to

immunize contumacious behavior." *Id.*   Accordingly, since not even a party to a lawsuit

can use a bankruptcy filing and the automatic stay to avoid contempt proceedings, nor

can a third party witness such as Kerry Poindexter, Valerie Poindexter or Overflow

Properties.  *See A.H. Robbins Co. v. Piccinin¸*788 F.2d 994, 999 (4th Cir. 1986) (holding

that absent "unusual circumstances," an automatic stay is generally not applicable to third

party defendants or co-defendants).  *Accord, Kreisler v. Goldberg*, 478 F.3d 209, 213 (4th

Cir. 2007).[21]

**B.**     **Given all of the Circumstances, This Court Should At A Minimum, Order
that Plaintiff's Expenses be Fully Compensated as Appropriate Sanctions**

      **1.**     **Whether Civil or Criminal, The Court Can Order that The Plaintiff
be Fully Compensated for Its Attorney Fees and Related Costs Based
on the Contempt Findings Against The Poindexters and Overflow
Properties**

---

[21] Courts only extend the protection of the automatic stay to non-bankrupt co-defendants
in the rare event that a debtor and a third party defendant's identities are so aligned the
debtor is the real party defendant and a judgment against the third party defendant will in
effect be a judgment against the debtor, such as when the third party defendant is entitled
to complete indemnity from the debtor.  *Kreisler*, 478 F.3d at 213. This limited exception
cannot apply to Poindexters or Overflow since they are not even co-defendants or third
party defendants, nor do they share the requisite identity with the Mohler Defendants.

The Court has already found the Poindexters and Overflow Properties to be in contempt on September 12, 2008. At that time the Court did not rule whether the contempt findings were criminal or civil in nature. However, the Court did give them an opportunity to purge their contempt by participating in their second depositions, testifying truthfully, and producing all documents and information sought by Plaintiff's subpoena (as well as turning over their computer for forensic examination without having deleted files and folders).  That did not happen.

Plaintiff is interested in expeditiously obtaining full compensation for the attorney fees and related expenses which the Plaintiff has had to incur due to the improper actions of the Poindexters and Overflow Properties. This can be obtained through civil or criminal contempt proceedings.

It is well recognized that a civil contempt proceeding is remedial and "coerces the defendant into compliance with the court's order" as well as "compensates the complainant for losses sustained." *Int'l Union United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). *See also In re Dill*, 300 B.R. at 667. Accordingly,[22] courts routinely sanction civil contemnor attorneys' fees and costs.  *See Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 822 (4th Cir. 2004) (recognizing attorneys' fees as appropriate compensatory remedies for civil contempt sanctions); *In re GMC*, 61 F.3d 256, (compensatory remedies for civil contempt include ordering the contemnor to reimburse the complainant for losses sustained and for reasonable attorney's fees and costs); *Koninklijke v. KXD Tech., Inc., 539 F.3d 1039* (9th Cir. 2008) (affirming district

---

[22] Sanctions that are imposed in criminal contempt proceedings may also compensate the complainant for any losses sustained, but also seek to punish the party held in contempt for his acts of disobedience.

court's civil contempt sanctions of $353,611.70 in attorney's fees; $37,098.14 in seizure and storage costs; and $ 1,284,090.00 in lost royalties as proper compensation to plaintiff).

In imposing sanctions, courts are authorized to imprison contemnors for their failure to comply with court orders. *See, e.g., Bagwell,* 512 U.S. at 828 (observing that "[t]he paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command"); *United States v. Conces*, 507 F.3d 1028 (6th Cir. 2007) (affirming district court's decision to imprison defendant for civil contempt in order to ensure his compliance with court's discovery orders); *United States v. Teeple*, 286 F.3d 1047 (8th Cir. 2002); *United States v. Brumfield,* 188 F.3d 303 (5th Cir. 1999).  Indeed, pursuant to 18 U.S.C. § 401, the Court has discretion to punish contemptuous actions, such as disobedience to its orders and commands, by leaving "fine[s], or imprisonment, or both" against the party held in contempt.

Whether a contempt proceeding is civil or criminal is determined by examining the "character and purpose of the sanction involved," not merely by the manner in which the contempt proceeding is labeled. *Int'l Union United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) (citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441, (1911)) (internal quotations omitted); *In re Dill*, 300 B.R. 658, 667 (Bankr. E.D.Va. 2003) (quoting *In re Maloney*, 250 B.R. 671, 674 (Bankr. E.D.N.Y. 1996)).

In the Eastern District of Virginia, in determining whether a contempt proceeding is civil or criminal, Courts have adopted an analysis which "examine[s] all aspects surrounding the contempt proceeding." *In re Rook*, 102 B.R. 490, 494 (Bankr. E.D.Va.

1989), *aff'd* 929 F.2d 694 (4th Cir. 1991). See also *In re Dunham*, 175 B.R. 615 (Bankr. E.D.Va. 1994).

Given the totality of the Poindexters' actions, including the subsequent actions of offering Sailor H. Mohler $5,000 (or more) to file his Petition in Bankruptcy so that the Poindexters might avoid being deposed as ordered by this Court, as well as the manual destruction and deletion of computer files, the Plaintiff is not certain whether or not the Court would find that civil contempt is appropriate.[23]

**2.     This Court Should Impose Serious Monetary And Other Sanctions Against The Poindexters and Overflow Properties**

The Poindexters appear to have deleted a substantial number of computer files in direct violation of this Court's order.  In **manually** deleting over 600 computer files, Poindexter has defied this Court's order to provide Plaintiff with their computers, untouched.  In addition to the 609 files that were manually deleted, thousands of files were automatically deleted or affected by continued operation of the computer because of the Poindexters defiance. Under such circumstances, the Poindexters should, at a minimum, be subject to the full measure of civil contempt sanctions.

Moreover, even in acknowledging that the computer was not turned off, Mrs. Poindexter seeks to implicate her attorney, Mr. Banks, [24] while Mr. Poindexter seems to implicate his wife.  Neither takes responsibility for the plain fact that files were deleted— including files pertaining to this litigation.  While many files appear to have been

---

[23] Plaintiff recognizes that the Court could conclude that the Poindexters' actions constitute criminal contempt, especially if the Court determines they can no longer come into compliance with the Court's order.

[24] During her deposition Mrs. Poindexter testified that her counsel, Chester Banks, told them that notwithstanding the Court's Order they could use the computers but could not delete any files. Exhibit 11 (VP Tr. at 11-12).  Mr. Banks has told plaintiff's counsel that he never so instructed the Poindexters.

recovered by Plaintiff's forensic experts at Plaintiff's expense, that is fortuitous and was accomplished despite the Poindexters' apparent efforts.

Furthermore, the acts of Kerry Poindexter to offer money to defendant Mohler to go into bankruptcy before the Poindexters' depositions was clearly done to avoid this Court's order that plaintiff be permitted to fully depose the Poindexters.

Finally, this matter, when reviewed in the totality of all the circumstances presented, paints a picture of critical third party witnesses who have evinced a total defiance for the rule of law in this matter, a defiance that has cost the Plaintiff in many substantial ways in its pursuit of justice against the Mohler Defendants.

In determining what sanctions to impose on the Poindexters, the Court should fashion remedies that both compensates Plaintiff for the substantial attorney's fees and costs that SonoMedica has incurred, including its forensic experts. Accordingly, at a bare minimum, Plaintiff's attorney's fees and other expenses related to the Poindexters and Overflow Properties should be paid to the Plaintiff (in an amount of $97,146.16), and in addition, the Plaintiff submits that the Poindexters should face possible incarceration until said sanctions are fully paid since Plaintiff's appear to have the means to pay these sanctions now. See Footnote 9 *supra* at 10.

Respectfully submitted,

SonoMedica, Inc., Plaintiff
By Counsel

_____/s/_____
Michael S. Lieberman
Virginia State Bar No. 20035
*Attorney for Plaintiff, SonoMedica, Inc.*
DiMuroGinsberg, P.C.
908 King Street, Suite 200

Alexandria, VA 22314
(703) 684-4333
(703) 548-3181 (Fax)
mlieberman@dimuro.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2ND day of January  2009, a true and accurate copy of the foregoing was sent via electronic mail using the court's CM/ECF system, which will send a notification of such filing (NEF) to the following:

Tameka M. Collier, Esquire
Troutman Sanders, LLP
401 9th Street, N.W.
Washington, DC 20004-2134

Stephen C. Piepgras, Esquire
William H. Hurd, Esquire
Ashely L. Taylor, Jr. Esquire
Troutman Sanders, LLP
1001 Haxall Point
Richmond, VA 23219
**Counsel for Defendants Sailor H. Mohler and Sailor C. Mohler**

Chester Banks, Esq.
3158 Golansky Blvd., Ste 201
Woodbridge, VA  22192-4227
**Counsel for Kerry and Valerie Poindexter and Overflow Properties**

_____/s/_____
Michael S. Lieberman
Virginia State Bar No. 20035
*Attorney for Plaintiff, SonoMedica, Inc.*
DiMuroGinsberg, P.C.
908 King Street, Suite 200
Alexandria, VA 22314
(703) 684-4333
(703) 548-3181 (Fax)
mlieberman@dimuro.com