**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **SONOMEDICA, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No. 1:08cv230** |
| | ) **UNREDACTED COPY FILED** |
| | ) **UNDER SEAL** |
| **SAILOR H. MOHLER** | ) |
| **And** | ) |
| **SAILOR C. MOHLER** | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR IMPOSITION OF**
**SANCTIONS AGAINST THIRD PARTY WITNESS JAMES CULLEN**
**(REDACTED)**

Plaintiff, SonoMedica, Inc., by counsel has moved this Court to enter an Order granting

Sanctions against third party witness James Cullen, who has previously been found in contempt

of court by Magistrate Judge Jones on September 12, 2008.  Exhibit 1.  At that time the Court

indicated that it would consider, at a later time, Plaintiff's requests for attorney fees and costs it

has incurred in pursuing these matters.  Plaintiff now seeks reimbursement and being made

whole. Among the relief sought by Plaintiff are substantial monetary sanctions to be paid to

Plaintiff for (1) its attorney fees and costs related to the contempt matter; (2) its costs that have

been incurred regarding the forensic examination of Mr. Cullen's computer; (3) the substantial

litigation costs[1] that were expended by Plaintiff due to the contemptuous actions of Mr. Cullen,

---

[1] At the September 12, 2008 hearing, Magistrate Judge Jones deferred ruling on plaintiff's
requests for attorney fees and other costs related to and caused by the contemptuous actions of
Mr. Cullen. (Exhibit 2, Tr. at 10-11, 19-20). The Court stated, however, that **"the forensic**
**examinations and the cost of the forensic examinations and the costs of the deposition will**
**as to each deponent be borne entirely by the deponents."** (emphasis added). (Exhibit 2, Tr. at

and (4) the costs that Plaintiff has now incurred, to date, in bringing this Motion before the Court.

In addition, Plaintiff seeks additional sanctions as this Court deems proper due to the failure of Mr. Cullen to ensure that the computer was turned off on September 12 as ordered by the Court, which resulted in the automatic deletion and modifications of files and folders; and (2) the failure of Mr. Cullen to testify candidly, honestly and fully at his prior depositions as now further evidenced by the documentation found on his computer.

An unredacted copy of this Motion and Memorandum, with attachments, is being filed under seal since the information obtained from Mr. Cullen's computer has, to this point, been deemed "for attorney and forensic examiner eyes only".  That complete copy has been mailed to Mr. Cullen's counsel and hand-delivered to Mr. Cullen.  Plaintiff files this redacted copy of the motion and memorandum by electronic service.

## I.      **FACTS**

### A.      **James Cullen was found in contempt on September 12, 2008 by Hon. Judge Jones**

On August 29, 2008, SonoMedica filed a Motion to Show Cause against James Cullen under Rule 45 as to why he should not be held in contempt for failing to abide by a lawfully issued notice of deposition with subpoena duces tecum and for perjury during his deposition on May14, 2008. (Exhibit 3).  (As noted in the moving papers, this was the first deposition taken in this litigation and was strategically critical because it was the first opportunity that Plaintiff had to try to find out (1) what had transpired between Passive Diagnostics and its former employee and board of director, Sailor H. Mohler and his son, Sailor C. Mohler, (2) what had been done

---

11). Moreover, the Court stated that as to additional costs related to the motions: "I'm not foreclosing anything…. I'm not going to spend any time on it until… I can deal with it as one organic whole." (Exhibit 2, Tr. at 20).

with SonoMedica's technology, and (3) what further actions SonoMedica needed to take through

discovery to learn the truth about the Passive Diagnostic transaction and any subsequent actions

taken in engineering and marketing SonoMedica's intellectual property.  And in a nutshell,

Plaintiff was completely misled, lied to and sent out on false leads by Mr. Cullen in its search for

the truth).

On September 12, 2008, Hon. Magistrate Judge Jones found as follows: "I find that Mr.

Cullen is in contempt for the reasons asserted in plaintiff's papers."[2]  (Exhibit 2, Tr. at 8).

Plaintiff's moving papers can be found at docket entries 131-133, 143, and Exhibit 3.

Magistrate Judge Jones then ordered Mr. Cullen, along with the Poindexters, in each of

their presence, to "each submit to reopened depositions for one or more additional sessions as

may be necessary" [and] "to deliver their computers to Mr. Lieberman's office not later than 10

o'clock Monday morning." (Exhibit 2, Tr. at 7-8). The Court then clearly stated that Mr. Cullen

and the Poindexters were prohibited from touching their computers except to immediately turn

them off and deliver them to Mr.  Lieberman's office for a forensic examination. Magistrate

---

[2] Among the grounds set forth in Plaintiff's moving papers was that: (1) Mr Cullen refused to bring to his deposition any identifying information regarding Fred Eichelberger despite his acknowledgement that he had such information in his possession; (2) Mr. Cullen provided Plaintiff with incomplete documentation regarding Passive Diagnostics and its incorporation (omitting a critical page that clearly identifies James Cullen as a Director of Passive Diagnostics, contrary to his May deposition testimony); (3) Mr. Cullen falsely testified at his deposition that no effort was made to sell SonoMedica's technology until after  Sailor H. Mohler was purportedly terminated by SonoMedica on December 18, 2007 and that all of the negotiations took place between December 18 and December 26, 2007; (4) Mr. Cullen misled plaintiff at his deposition as to his knowledge as to marketing and other activities that had taken place since the signing of the agreement between Passive Diagnositcs and Sailor H. Mohler on December 26, 2007; (5) Mr. Cullen misled plaintiff at his deposition as to his role in the post contract activities and actions between Passive Diagnostics and the Mohlers; including how Mohler was paid by Passive Diagnostics, in part, through Mr. Cullen's LLC, P-4 LLC;  and (6) Mr. Cullen failed to turn over documents covered by the subpoena duces tecum that had been in Cullen's possession, including at least 6 emails, that were pertinent, if not critical to, the litigation between SonoMedica and the Mohlers.

Judge Jones stated:

> And, and they may not touch the computers except to turn them off between now and then. They may not do anything that would cause any file to be erased on the computer or changed in any way beyond what might happen through the ordinary, everyday act of turning off the computer.  Exhibit 2 (Sept. 12 Tr. at 8).

In his concluding remarks, Judge Jones noted that "I have directed the subpoenaed people and entity to do certain things, and I have continued the matter for further proceedings. So, you will not see a written order yet as a result of today's hearing." (Exhibit 2, Tr. at 20).

In its Minute Order, the Court was clear as to its rulings that Mr. Cullen and the Poindexters were to deliver their computers to plaintiff's counsel on September 15, 2008 and that "they may not touch the computer except to turn them off between now and then."  See Exhibit 1, Minute Order. (Docket No. 151).

At the September 12, 2008 hearing the Court also scheduled two hearings before Hon. Judge Lee because Magistrate Judge Jones noted that he did "not have the power to jail someone for contempt. Judge Lee does." (Exhibit 2, Tr. at 9). Moreover in providing Mr. Cullen and the Poindexters with the opportunity to purge themselves of contempt, Magistrate Judge Jones responded to their counsel's question of whether the parties would purge themselves of contempt by "participating in the redeposition" by stating:

> Not by participating, not merely by participating, but by having produced everything that the subpoena required them to produce and by having testified truthfully at the depositions.  Merely showing up is not going to be enough to purge anyone of contempt.

Exhibit 2, (Tr. at 12).

Finally, at the September 12, 2008 hearing, Magistrate Judge Jones deferred ruling on Plaintiff's requests for attorney fees and other costs related to and caused by the contemptuous actions of Mr. Cullen. (Exhibit 2, Tr. at 10-11, 19-20). The Court stated, however, that "**the**

forensic examinations and the cost of the forensic examinations and the costs of the
deposition will as to each deponent be borne entirely by the deponents." (emphasis added).
(Exhibit 2, Tr. at 11). Moreover, the Court stated that as to additional costs related to the
motions: "I'm not foreclosing anything…. I'm not going to spend any time on it until… I can
deal with it as one organic whole." (Exhibit 2, Tr. at 20).

Thereafter, on September 15, 2008, at or before 10 o'clock a.m., Mr. Cullen delivered a
single desktop computer that he represented was his (actually his wife's) only computer that was
used for his personal and business use.

**B.**    **Post September 12 Actions and Information Learned**

**(i)  Contrary to the Court's Order, The Computer Was Used After the
September 12 Hearing, On At least Four Occasions, Causing Deletions and
Modifications to Files and Folders.**

After receipt of the desktop computer, later that same day, Mr. Cullen's computer was
brought to Sensei Enterprises ("Sensei") for a forensic examination.

On September 16, 2008, Sensei issued its initial report disclosing that the Cullen
computer had not been turned off until 4:51.47 A.M. on September 15, 2008 (just hours before it
was brought to Lieberman's office) and that numerous files had been accessed on or after
September 12, 2008 at 3:00 p.m. EDT.  (Exhibit 4).

On September 17, 2008, Sensei issued a report stating that between the time Mr. Cullen
was in court on September 12 and the time he brought his computer to Plaintiff's counsel, the
computer had been shut down and started up four additional times. (Exhibit 5). In this report the
final shut down time was stated as 4:59:32 AM EDT, on Monday, September 15, 2008. The
report stated that "approximately 4,272 files/folders were affected by the computer being
operational."  Moreover, "activity included file/folder creation, modification, access, deletion

and MFT entry modification (both user initiated and system (no user intervention) initiated)".

Finally,  Sensei reported that "approximately 677 files were deleted during the above activity

range; consisting of system (no user intervention) initiated deletion." [3]

Accordingly, there can be no doubt that this Court's Order to shut down the computer and

not touch it until delivered to Plaintiff's counsel was ignored by Mr. Cullen.

### (ii)   Plaintiff's Request for Additional Documents and Payment for the Deposition and Forensic Examination As Ordered by the Court Goes Unanswered

On September 16, 2008, Plaintiff's counsel sent a letter to counsel for Mr. Cullen and the

Poindexters, Chester L. Banks, seeking, *inter alia,* advance payment by Mr. Banks clients for the

cost of the forensic examination and the cost of the depositions which Magistrate Judge Jones

had clearly ordered be paid for entirely by the deponents.

See Exhibit 6.  Plaintiff's counsel also sought to arrange for the production and delivery  of any

additional documents covered by the subpoenas duces tecum related to this matter on the

Monday (September 22) preceding the re-depositions of the deponents.  Estimates of deposition

and forensic costs were attached to the letter to Mr. Banks.

While promises of payments were made, none were ever forthcoming.  Nor were any

additional documents ever produced before the redepositions. Re-depositions were scheduled

and taken on September 23 (Cullen) and 24 (Poindexters) although limited because no additional

documents had yet been produced by deponents or by Sensei.

### (iii)  Critical Information Was Found On Cullen's Computer

When Plaintiff finally obtained copies of documents from Mr. Cullen's computer and that

---

[3] Sensei also reported that the system clock was dated one day behind and set to Pacific Daylight Time, but that in reporting the activity range dates and times, the report was adjusted for the discrepancy. (Exhibit 5).

of the Poindexters, there was a treasure trove of information not previously provided to Plaintiff's counsel. The Poindexters information has been dealt with in a separate motion.

As to the documents and email files obtained from Mr. Cullen's computer, numerous documents were found that had never been turned over to Plaintiff by Mr. Cullen (or anyone else for that matter as to some documents) which were relevant, material and important to the issues being litigated between SonoMedica and the Mohlers, and others which were germane to demonstrating that Mr. Cullen had not testified fully or truthfully at his depositions.

These documents that had not been previously provided to Plaintiff by Mr. Cullen, but which were obviously covered by the subpoena duces tecum, are attached as exhibits to this Motion (Exhibit 7-under seal) and are briefly described below. It should be recalled that this subpoena duces tecum and deposition were the first taken in this litigation and was planned to be the foundation for pursuing subsequent discovery to get to the truth of what had occurred. As the Court can see from a review of these documents, much activity was taking place before the subpoena duces tecum was issued that should have been, but was not, disclosed by Cullen, including substantial engineering and marketing activities by Passive Diagnostics and those associated with it.  Many of these activities and the leads disclosed from the documents were never known to SonoMedica until after the discovery cut off and the expenses involved in uncovering this information were extraordinarily costly compared to Mr. Cullen having properly turned over the documents when they were sought by the subpoena served on Mr. Cullen.  For instance, ███████████████████████████████████ was never known to SonoMedica and is clearly a document that should have been produced by Mr. Cullen. This document would have led to discovery requests by SonoMedica that to this day SonoMedica has never been able to undertake and the collateral consequences of which are still unclear to

SonoMedica. At a minimum, Mr. Cullen's actions in failing to provide this documentation in a timely manner cost SonoMedica tens of thousands of dollars to chase down these documents from several other avenues, to the extent it could.  The relevant documents are set out in Exhibit 7 and bates-stamped "Cullen #" and are as follows:

1.  Documents showing various arrangement between Sailor H. Mohler and Cullen and/or Passive Diagnostics:



2.  Documents disclosing significant engineering and marketing efforts being undertaken by Passive Diagnostics to produce and sell the CardioSond in March and April 2008 that were withheld during Cullen's depositions (as well others):



[redacted]

[redacted] www.heartear.com [redacted]



[redacted]

c. Documents from Passive Diagnostics USA, Inc., dated April 2008, including:

[redacted]



[redacted]

[redacted] Report, Log (Cullen 222) dated March 14, 2008 reporting on [redacted]

e. Document [redacted]

[redacted] Documents showing relationship between Passive Diagnostics USA Inc., and Kerry Poindexter, [redacted]

██████████████████████████████████████████████

██████████████████████████████████████████

████████

██████████████████████

██████████████████████████████████████

██████████████████████████

██████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████

██████████████████████████

██ Several documents from March 2008 to ████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

5.   Miscellaneous Documents of Importance:

██████████████████████████████████████████████

████████████████



### C.   <u>The Second Deposition of James Cullen</u>

At first blush, Mr. Cullen's second deposition was certainly more forthcoming than in his first, for which he has already been found in contempt.  But, upon closer review, and especially in view of the documents found on his computer, SonoMedica still maintains that Mr. Cullen was less than truthful and clearly not fully forthcoming.

First, it was learned through the second deposition that despite the subpoena duces tecum, and despite the motions to show cause, Mr. Cullen **never** made any effort to have his computer checked for documents that were sought by the subpoena duces tecum.

Q.   When was the last time you looked through your emails to see whether or not you

---

[4] Cullen testified in his first deposition that he had a laptop but it was never used. (Exhibit 8 - 5/14/08 Tr. at 88).

had any emails that discussed Passive Diagnostics or Mr. Mohler?

A.      I have never done that. I have never done that. I guess I should have. I
        never had. (Exhibit 9- Tr. 9/23/08 at 27)

Second, while Mr. Cullen states that he did not turn the computer on or off between

September 12 and 15, 2008 after this Court ordered that the computer be turned off, he claims

that he told his wife "we had to shut off the computer" but he never seemed to tell her that she

had to leave it off, stating that "I'm sure my wife checked e-mails or whatever, you know."

(Exhibit 9- Tr. 9/23/08 at 58).  Upon further examination, it became clear that all he told his wife

was to not delete anything (because "there's nothing on there anyway. There's garbage stuff.").

*Id.* at 59.

Third, it became abundantly clear throughout the deposition that Mr. Cullen had a lot of

relevant documentation in hard copy at his house that he failed to bring to his second (or first)

deposition, including information regarding the domain name Passive Diagnostics (Exhibit 9- Tr.

9/23/08 at 17-18); documentation regarding the monies spent by Passive Diagnostics or

Eichelberger's Essential Concepts on purchasing equipment and the like pertaining to the

HeartEar, (*Id.* at 122);  expense sheets setting out the expenses incurred by Passive Diagnostics

or Fred Eichelberger regarding the January 2008 meeting in Florida regarding the HeartEar

device, (*Id.* at 138); documentation regarding payments, loans or advances to Poindexter, (*Id.* at

140-143); invoices for the production of the HeartEar, (*Id.* at 151-152); invoices for research

work by Harrison Jett on the Heart Ear (*Id.*at 155-157); and other related invoices (*Id.* at 158-

159). To this date, these documents have still not been produced by Mr. Cullen despite promises

to the contrary.

Fourth, even during his second deposition he refused to acknowledge that Passive

Diagnostics was incorporated in order to hold the IP obtained from Sailor Mohler, (Exhibit 9- Tr.

9/23/09 at 14-17) (just as he had testified in his first deposition), but which is directly contrary to the documentation found on his computer indicating that Passive Diagnostics ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████

Fifth, although Mr. Cullen was forthcoming with a few marketing efforts that were being undertaken by Passive Diagnostics, (Exhibit 9-Tr. 9/23/08 at 41-55, 86), he failed to fully disclose ████████████████████████████████████████████ ██████████████████████

Sixth, when asked if he had any financial interest in any companies or entities [with] Mr. Eichelberger… he responded "the only company I know of Fred has is Essential Concepts. (Exhibit 9-Tr. 9/23/08 at 75). Documentation ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████

Seventh, as far as his knowledge of the negotiations between Mohler and Passive Diagnostics taking place before December 18, 2007, his testimony was equivocal at best. (Exhibit9- Tr. 9/23/08 at 100-117). When confronted with documentation showing that he was involved in November and December 2007, he would say "I can't remember" or" I can't recall," or "I can't remember anything in particular."  Yet, the seminal document written on November 5, 2007 by Fred Eichelberger that was sent to his lawyer, Jenkins, and Cullen, outlining Passive Diagnostic's  offer to Mohler to purchase SonoMedica's intellectual property, ████████████ ████████████████████████████

**D.** **Plaintiff Has Expended A Substantial Amount of Attorney Fees and Costs Due to the Improper and Contemptuous Actions of James Cullen that Should Be Reimbursed**

At the September 12, 2008 hearing, Magistrate Judge Jones stated that Mr. Cullen would be responsible for the forensic examination of his computer and for the cost of his deposition, and that other costs sought by Plaintiff would be dealt with at a later time.  Through this Motion, Plaintiff seeks those fees and costs directly related to the actions of James Cullen.

Attached to this Memorandum is Exhibit 10 which is a color coded spreadsheet that attempts to provide the Court with all of the activities performed by the DiMuroGinsberg law firm regarding Mr. Cullen since the preparation of the subpoena duces tecum in early May 2008 in pursuit of obtaining all of the documents sought by the subpoenas and in obtaining truthful testimony during depositions, including seeking compliance through this Court.  The spreadsheet is color coded in an effort to assist the Court. The Cullen related activities by the law firm are set out by each task,  including those pertaining to (1) Cullen's first deposition (in orange); (2) the post deposition investigative efforts to obtain records disclosed but not produced by Cullen regarding the production or marketing of the HeartEar (in green); (3) the Motion to Show Cause (in blue); (4) the post contempt hearing efforts including: those involving forensic examination; re-deposition, and review of additional documents from computer (in purple); and (5) the preparation of the instant Motion and Memorandum (in yellow).

The total attorney fees are calculated to be: $37,273.75 and the total costs are calculated to be $4971.32, for a total of $42,245.07.  The reasonableness and necessity for these fees and costs are attested to by the undersigned counsel in an attached affidavit. Exhibit 11.  Invoices pertaining to Plaintiff's costs are attached as Exhibits 13 and 14.

For the Court's convenience, a copy of the original Notice of Deposition subpoena and

subpoena duces tecum (Attachment A) is attached as Exhibit 12.

## II.    ARGUMENT

### A.    Given all of the Circumstances, This Court Should At A Minimum, Order that Plaintiff's Expenses be Fully Compensated as Appropriate Sanctions

The Court has already found Mr. Cullen to be in contempt on September 12, 2008. At that time the Court did not rule whether the contempt findings were criminal or civil in nature. However, the Court did give Mr. Cullen an opportunity to purge himself of contempt by participating in his second depositions, testifying truthfully, and producing all documents and information sought by Plaintiff's subpoena (as well as turning over their computer for forensic examination without having deleted files and folders). That did not happen.

Plaintiff is interested in expeditiously obtaining full compensation for the attorney fees and related expenses which the Plaintiff has had to incur due to the improper actions of Mr. Cullen. This can be obtained through civil or criminal contempt proceedings.

It is well recognized that a civil contempt proceeding is remedial and "coerces the defendant into compliance with the court's order" as well as "compensates the complainant for losses sustained." *Int'l Union United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 827 (1994). *See also In re Dill,* 300 B.R. at 667. Accordingly,[5] courts routinely sanction civil contemnor attorneys' fees and costs. *See Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 822 (4th Cir. 2004) (recognizing attorneys' fees as appropriate compensatory remedies for civil contempt sanctions); *In re GMC*, 61 F.3d 256, (compensatory remedies for civil contempt include ordering the contemnor to reimburse the complainant for losses sustained and for reasonable attorney's fees and costs); *Koninklijke v. KXD Tech., Inc., 539 F.3d 1039* (9th Cir. 2008) (affirming district

---

[5] Sanctions that are imposed in criminal contempt proceedings may also compensate the complainant for any losses sustained, but also seek to punish the party held in contempt for his acts of disobedience.

court's civil contempt sanctions of $353,611.70 in attorney's fees; $37,098.14 in seizure and storage costs; and $ 1,284,090.00 in lost royalties as proper compensation to plaintiff).

In imposing sanctions, courts are authorized to imprison contemnors for their failure to comply with court orders. *See, e.g., Bagwell,* 512 U.S. at 828 (observing that "[t]he paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command"); *United States v. Conces*, 507 F.3d 1028 (6th Cir. 2007) (affirming district court's decision to imprison defendant for civil contempt in order to ensure his compliance with court's discovery orders); *United States v. Teeple*, 286 F.3d 1047 (8th Cir. 2002); *United States v. Brumfield,* 188 F.3d 303 (5th Cir. 1999). Indeed, pursuant to 18 U.S.C. § 401, the Court has discretion to punish contemptuous actions, such as disobedience to its orders and commands, by leaving "fine[s], or imprisonment, or both" against the party held in contempt.

Whether a contempt proceeding is civil or criminal is determined by examining the "character and purpose of the sanction involved," not merely by the manner in which the contempt proceeding is labeled. *Int'l Union United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) (citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441, (1911)) (internal quotations omitted); *In re Dill*, 300 B.R. 658, 667 (Bankr. E.D.Va. 2003) (quoting *In re Maloney*, 250 B.R. 671, 674 (Bankr. E.D.N.Y. 1996)).

In the Eastern District of Virginia, in determining whether a contempt proceeding is civil or criminal, Courts have adopted an analysis which "examine[s] all aspects surrounding the contempt proceeding." *In re Rook*, 102 B.R. 490, 494 (Bankr. E.D.Va. 1989), *aff'd* 929 F.2d 694 (4th Cir. 1991). See also *In re Dunham*, 175 B.R. 615 (Bankr. E.D.Va. 1994).

Given the totality of Mr. Cullen's actions, including the post September 12, 2008 actions

set out above, the Plaintiff is not certain whether or not the Court would find that civil or criminal contempt is appropriate. Regardless, Plaintiff asks that the Court order Mr. Cullen to place no less than $43,000 with the Court to cover Plaintiff's attorney fees and costs to date, pending final adjudication of this matter.

## CONCLUSION

For the forgoing reasons, Plaintiff SonoMedica requests this Court to grant this Motion for Sanctions and to award SonoMedica not less than $42,245.07 for its out of pocket attorney fees and related costs caused by Mr. Cullen's contemptuous actions as well as any other relief that the Court deems proper.

**Respectfully submitted,**

SonoMedica, Inc.
By Counsel

_/s/_____
Michael Lieberman, Esquire
VSB #20035
Counsel for SonoMedica, Inc.
DiMuroGinsberg, P.C.
908 King Street, Suite 200
Alexandria, VA 22314
(703) 684-4333
(703) 548-3181 (Fax)
mlieberman@dimuro.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July 2009, a true and accurate copy of the foregoing Motion for Sanction, Memorandum In Support of Motion with attachments and the Notice of Motion Hearing was sent via electronic mail using the court's CM/ECF system, which will send a notification of such filing (NEF) to the following:

Tameka M. Collier, Esquire
Troutman Sanders, LLP
401 9th Street, N.W.
Washington DC 20004-2134
Tel/Fax 202-274-2856
202-654-5620

Stephen C. Piepgras, Esquire
William H. Hurd, Esquire
Ashely L. Taylor, Jr. Esquire
Troutman Sanders, LLP
1001 Haxall Point
Richmond, VA 23219
804-697-1335
804-698-6058 (Fax)
stephen.piepgrass@troutmansanders.com
william.hurd@troutmansanders.com
ashley.taylor@troutmansanders.com
*Counsel for Defendants*

Chester L. Banks, Esq. (VSB #28141)
3158 Golansky Blvd.  Ste 201
Woodbridge, Va 22192
Fax:  703-878-7171
*Counsel for Mr. Cullen*

It is further certified that an unredacted and sealed copy of the above has been filed by hand with
the court and that copies of the unredacted and sealed copy has been sent by U.S. Mail, first
class, postage prepaid to Counsel for Mr. Cullen:

Chester L. Banks, Esq. (VSB #28141)
3158 Golansky Blvd.  Ste 201
Woodbridge, Va 22192
Fax:  703-878-7171

And that an unredacted, sealed copy of the above has been served by hand delivery on Mr. James
Cullen at 2623 Woodley Place, Falls Church, Va 22046

_____/s/_____
Michael S. Lieberman
Virginia State Bar No. 120035
*Attorney for Plaintiff, SonoMedica, Inc.*
DiMuroGinsberg, P.C.
908 King Street, Suite 200
Alexandria, VA 22314

(703) 684-4333
(703) 548-3181 (Fax)
mlieberman@dimuro.com

## LIST OF ATTACHED EXHIBITS

1.      **Minute Order, Contempt Finding,  September 12, 2008**

2.      **Hearing Transcript, September 12, 2008**

3.      **Motion and Memorandum To Show Cause, August 29, 2008**

4.      **Sensei Report, September 16, 2008**

5.      **Sensei Report, September 17, 2008**

6.      **Letter, September 16, 2008 Lieberman to Banks**

7.      **Documents from Cullen Computer (under seal)**

8.      **Deposition Transcript, May 14, 2008**

9.      **Deposition Transcript, September 23, 2008**

10.     **Spreadsheet of Attorney Fees and Costs (color Coded) (under seal)**

11.     **Affidavit of Michael S. Lieberman, July 30, 2009**

12.     **Subpoena and Subpoena Duces Tecum, Attachment A**

13.     **Invoices re: Depositions of Mr. Cullen**

14.     **Sensei Invoices re: Mr. Cullen**